UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>JONATHAN DAVILA,<br><br>Defendant. | 23 Cr. 292 (JSR) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Danielle R. Sassoon
Assistant United States Attorney
-Of Counsel

## TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................ 1

II.     DISCUSSION ................................................................................................... 1

        A.    *Bogle*, *Heller*, and *McDonald* All Confirm the Constitutionality of Section
              922(g)(1)'s Prohibition on Felons' Possession of Firearms ................................. 2

        B.    *Bruen* Does Nothing to Undermine Section 922(g)(1) or *Bogle* ........................... 4

        C.    Text and History Confirm that 18 U.S.C. § 922(g)(1) Is Consistent with
              the Second Amendment ....................................................................................... 7

              1.    The Text of the Second Amendment and Its Historical Context
                    Make Plain that Davila, a Convicted Felon, Cannot Mount a
                    Successful Attack on 18 U.S.C. § 922(g)(1). ............................................... 7

              2.    Section 922(g)(1) Is Consistent with This Nation's Historical
                    Tradition of Firearms Regulation ................................................................ 12

                    a.    Firearm Disqualification Laws ...................................................... 13

                    b.    Felony Punishment Laws .............................................................. 19

                    c.    Comparison to Section 922(g)(1) .................................................. 21

        D.    Davila Fails to Differentiate Himself from the Historically Excluded Class ....... 22

III.    CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Binderup v. Att'y Gen.*,
  836 F.3d 336 (3d Cir. 2016)......................................................................... 23

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................................................. 2, 3

*Folajtar v. Att'y Gen.*,
  980 F.3d 897 (3d Cir. 2020)......................................................................... 23

*In re United States*,
  578 F.3d 1195 (10th Cir. 2009) .................................................................... 22

*McDonald v. City of Chicago, Ill.*,
  561 U.S. 742 (2010)................................................................................. 2, 3

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) ................................................................. passim

*New York State Rifle & Pistol Assn., Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)......................................................................... passim

*Range v. Attorney General*,
  69 F.4th 96 (3d Cir. 2023) (en banc) ...................................................... 8, 23, 24

*Range v. Attorney General*,
  53 F.4th 262 (3d Cir. 2022) (per curiam)................................................... passim

*Schrader v. Holder*,
  704 F.3d 980 (D.C. Cir. 2013)........................................................................ 3

*United States v. Anderson*,
  559 F.3d 348 (5th Cir. 2009) ......................................................................... 3

*United States v. Barton*,
  633 F.3d 168 (3d Cir. 2011)........................................................................... 3

*United States v. Bogle*,
  717 F.3d 281 (2d Cir. 2013)................................................................... passim

*United States v. Booker*,
  644 F.3d 12 (1st Cir. 2011)......................................................................... 22

*United States v. Carey*,
  602 F.3d 738 (6th Cir. 2010) ......................................................................... 3

*United States v. Jackson*,
  69 F.4d 496 (8th Cir. 2023) ................................................................... passim

*United States v. Jimenez*,
  895 F.3d 228 (2d Cir. 2018)...................................................................... 3, 12

*United States v. Joos*,
  638 F.3d 581 (8th Cir. 2011) ......................................................................... 3

*United States v. King*, No. 21-cr-255 (NSR),
  2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022) ......................................................... 7

*United States v. Lucha El Libertad*, No. 22 Cr. 644 (JSR),
  (S.D.N.Y. July 7, 2023) ................................................................. 1, 14, 15, 23

*United States v. Massey*,
  849 F.3d 262 (5th Cir. 2017) ............................................................... 22
*United States v. McCane*,
  573 F.3d 1037 (10th Cir. 2009) ........................................................... 3
*United States v. Moore*,
  666 F.3d 313 (4th Cir. 2012) ............................................................... 3
*United States v. Roszkowski*,
  700 F.3d 50 (1st Cir. 2012).................................................................. 3
*United States v. Rozier*,
  598 F.3d 768 (11th Cir. 2010) ......................................................... 6, 22
*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ......................................................... 17, 22
*United States v. Sitladeen*,
  64 F.4th 978 (8th Cir. 2023) ............................................................... 4
*United States v. Torres-Rosario*,
  658 F.3d 110 (1st Cir. 2011)................................................................ 23
*United States v. Vongxay*,
  594 F.3d 1111 (9th Cir. 2010) ...................................................... 3, 6, 10
*United States v. Williams*,
  616 F.3d 685 (7th Cir. 2010) ......................................................... 3, 22

## Statutes

*An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790). 18
18 U.S.C. § 922(g)(1) ........................................................................... passim
4 *Journals of the Continental Congress 1774-1789* (1906) ............................ 16
1 *The Laws of Maryland, With the Charter, the Bill of Rights, the Constitution of the State, and
  Its Alterations, the Declaration of Independence, and the Constitution of the United States,
  and Its A*mendments (1811) ................................................................ 15
1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) ................ 16
1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255 (1823) .......... 15
1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* (1688)....................... 13
1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* (1688)...................... 13
2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) .......... 15
2 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1896) .................... 15
2 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 481 (1823)........... 15
5 *Records of the Colony of New Plymouth* 173 (1856)................................. 15
5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479
  (1886)......................................................................................... 16
6 *The Public Records of the Colony of Connecticut* 381 (1872) ........................ 15
6 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1899) .................... 15
7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567
  (1862)......................................................................................... 16
9 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1903) .................... 16
9 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 282 (1821)........... 16
*A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force
  and Use* 152 (1773)......................................................................... 15

iii

*Act of Apr. 1, 1778*, ch. LXI, § 5, 1777-1778 P.A. Laws 123 ..................................... 20

*Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776* (1777) ...................................................................................................... 16

*Digest of the Laws of the State of Georgia from Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799* (1800) ............................ 15

*Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753)............................................................................................ 15

*Laws and Ordinances of New Netherland, 1638-1674* (1868) ................................................ 15

*Laws of New York From the Year 1691 to 1773* (1752) ........................................................... 15

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (1890).......... 14

## Other Authorities

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ................................... 17

4 William Blackstone, *Commentaries on the Laws of England* 95 (1769)................................... 19

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 116 (2011) ........ 19

Akhil Reed Amar, *The Bill of Rights* (1998) .............................................................................. 9

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ................. 20

Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006) ..................................................................................................................... 15

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms (2008)*................................................................................................................................... 18

Stuart Banner, *The Death Penalty: An American History* (2002) ............................................. 20

The Government respectfully submits this memorandum of law in support of its opposition to defendant Jonathan Davila's motion to dismiss the Indictment in this case (the "Motion"). Just as this Court recently denied a motion which argued that 18 U.S.C. § 922(a)(3) is unconstitutional under the Second Amendment, so too the Court should deny reject the defendant's similar claim here with respect to 18 U.S.C. § 922(g). *See United States v. Lucha El Libertad*, 22 Cr. 644 (JSR), Dkt. 52 (S.D.N.Y. July 7, 2023).

## I.     BACKGROUND

On June 14, 2023, a grand jury returned an indictment charging the defendant with unlawfully possessing a firearm on or about April 17, 2023, in violation of 18 U.S.C. § 922(g)(1). (Dkt. 6). On that date, the defendant menaced a woman with a firearm in a dispute over a parking space, fled from NYPD officers, and was apprehended when he fell to the ground, dropping the firearm during his fall. (Dkt. 1).

Under Section 922(g)(1), the defendant was prohibited from possessing a gun on April 17, 2023, because he has previously been convicted of a felony. In particular, the defendant has been convicted of: (1) assault in the second degree (intent to cause physical injury with weapon/instrument), in violation of New York Penal Code § 120.05; (2) criminal sale of a controlled substance in the second degree, in violation of New York Penal Law § 220.41; and (3) manslaughter in the first degree, in violation of New York Penal Code § 125.20.

## II.    DISCUSSION

Davila moves to dismiss the indictment, arguing that his conduct falls within the scope of the Second Amendment because Section 922(g)(1) is unconstitutional under the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), both facially and as-applied to Davila. Davila is incorrect. The Second Circuit has upheld Section 922(g)(1) against facial challenge—a decision that *Bruen* does nothing to undermine—and there

is no support for Davila's argument that a felon convicted of three felonies, including two violent felonies, has a Second Amendment right to possess a firearm. Instead, guided by the Supreme Court's repeated statements about the constitutionality of prohibitions on the possession of firearms by felons, and bound by the Second Circuit's holding on this very matter, this Court should conclude that Section 922(g)(1) is constitutional. Finally, the Court should reject Davila's as-applied challenge because, based on his prior violent and dangerous conduct, he falls squarely within the class of persons who can be constitutionally prohibited from bearing arms.

## A.   *Bogle*, *Heller*, and *McDonald* All Confirm the Constitutionality of Section 922(g)(1)'s Prohibition on Felons' Possession of Firearms

The Supreme Court has reiterated, time and again, that its decisions interpreting the Second Amendment "d[o] not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)); *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (confirming that the Supreme Court's most recent decision—in *Bruen*—specifically allows the "longstanding prohibitions on the possession of firearms by felons" blessed in *Heller* and *McDonald*).

Based on the Supreme Court's "emphasi[s] that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" the Second Circuit held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (per curiam) (quoting *Heller*, 554 U.S. at 626, and citing *McDonald*, 561 U.S. at 786 (plurality)). And "[f]acial challenges to the statute's constitutionality have failed in every circuit to have considered the issue." *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019) (collecting cases), *cert. denied*, 140 S. Ct. 645 (2019).

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of *law-abiding*, responsible citizens" to possess a handgun in the home for self-defense. 554 U.S. at 635 (emphasis added). The Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626; *see also id.* at 631 ("Before this Court petitioners have stated that 'if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified,' by which they apparently mean if he is *not a felon* and is not insane.") (emphasis added)). Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that it "made . . . clear" in *Heller* that its "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald*, 561 U.S. at 786 (plurality) (quoting *Heller*, 554 U.S. at 626).

Following *Heller* and *McDonald*, and expressly incorporating as law their discussions ratifying "longstanding prohibitions on the possession of firearms by felons," the Second Circuit held that § 922(g)(1) "is a constitutional restriction on the Second Amendment rights of convicted felons." *Bogle*, 717 F.3d at 281–82.[1] Nothing since *Bogle* has placed this conclusion in doubt. *See, e.g.*, *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) (citing *Bogle* as good law).

---

[1] The Second Circuit is not alone. Every single regional Circuit has considered this question and come to the same conclusion. *See, e.g.*, *United States v. Roszkowski*, 700 F.3d 50, 58 (1st Cir. 2012); *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011); *United States v. Moore*, 666 F.3d 313, 318–19 (4th Cir. 2012); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 693–94 (7th Cir. 2010); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013). *See also Bogle*, 717 F.3d at 281–82 ("We therefore join every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons.").

**B.**     *Bruen* **Does Nothing to Undermine Section 922(g)(1) or** *Bogle*

Davila argues that a recent Supreme Court case—*Bruen*—renders Section 922(g)(1) unconstitutional. (Motion at 6-7). This argument has no merit: it would require the Court to disregard not only *Heller* and *McDonald*, but also *Bruen* itself.

*Bruen* did not undermine all prior Second Amendment precedent in the Courts of Appeals. *See United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (concluding that prior circuit precedent upholding 18 U.S.C. § 922(g)(5)(A) "is undisturbed by *Bruen*, and we therefore remain bound by it"); *Lucha El Libertad*, 22 Cr. 644 (JSR), Dkt. 52 at 2-3 (noting that prior Second Circuit holding that Section 922(a)(3) "does not on its face regulate core Second Amendment conduct survives *Bruen* unscathed"). *Bogle* is wholly consistent with the *Bruen* framework and thus remains good law.

Critically, this Court did not employ in *Bogle* the means-end test later disapproved in *Bruen*; instead, this Court applied the reassurances of *Heller* and *McDonald* regarding the validity of "'longstanding prohibitions on the possession of firearms by felons.'" *Bogle*, 717 F.3d at 281 (quoting *Heller*, 554 U.S. at 626). And as the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* are supported by history. *Bruen*, 142 S. Ct. at 2128 (explaining that in *Heller*, the Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting) (explaining that *Heller* and *McDonald* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals"); *Heller*, 554 U.S. at 626, 635 (acknowledging that "permissible" regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported

by "historical analysis" and "historical justifications"). It would therefore make little sense to con-clude that *Bruen* meant, *sub silentio*, to discard *Heller*'s and *McDonald*'s repeated admonitions that felon-disarmament is wholly consistent with the Second Amendment. *See Heller*, 554 U.S. at 626, 631; *McDonald*, 561 U.S. at 786 (plurality).

Indeed, eight members of the *Bruen* Court have made clear that *Bruen* did *not* upend the Court's prior recognition of lawful firearm regulations. In *Bruen* itself, six justices took pains to emphasize that the decision did nothing to upset *Heller*'s and *McDonald*'s reassurances. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald*. . ., about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "longstanding prohibitions on the possession of firearms by felons" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms). In addition, two years earlier, Justice Thomas and Justice Gorsuch "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *City of New York*, 140 S. Ct. at 1540-41 (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting). Thus, eight of the nine members of the *Bruen* Court have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes.

Davila dismisses the Supreme Court's reassurances in *Heller* and *McDonald* as "dicta." (Motion at 3). But the Supreme Court's express limitations of its own opinions—which help couch

the boundaries of the test in *Heller* that was repeated in *McDonald* and clarified in *Bruen*—were not dicta. *See, e.g., United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (explaining that "the Court's language about certain long-standing restrictions on gun possession is [not] dicta" because "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings"); *United States v. Huet*, 665 F.3d 588, 600 n.11 (3d Cir. 2012) ("Although some of our sister circuits have classified the 'presumptively lawful' language in *Heller* as dicta, . . . we disagree."); *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) ("to the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta").[2] However, even if it were dicta, it must still "be given considerable weight and [cannot] be ignored in the resolution of the" issue before this Court. *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975); *see also, e.g., United States v. Colasuonno*, 697 F.3d 164, 178-79 (2d Cir. 2012) (acknowledging that it is the "usual obligation to accord great deference to Supreme Court dicta" except in certain circumstances, such as when Congress has "removed or weakened the conceptual underpinnings" of a decision). In any event, when this Court adopted the reassurances of *Heller* and *McDonald* as the core basis of its holding in *Bogle*, it became binding in this Circuit.

Accordingly, nothing in *Bruen* undercuts *Bogle*. By following *Heller* and *McDonald*, this Court necessarily upheld Section 922(g)(1) because such a regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at

---

[2]     Notably, in *Bruen*, Justice Kavanaugh—joined by Chief Justice Roberts—"wr[o]te separately to underscore two important points about the limits of the Court's decision," one of which was that "the Second Amendment allows a 'variety' of gun regulations," including prohibitions on convicted felons possessing firearms. *Bruen*, 142 S. Ct. at 2161–62 (Kavanaugh, J., concurring). Without Justice Kavanaugh and Chief Justice Roberts, the *Bruen* opinion would not have commanded a majority; accordingly, even if *Heller*'s limitation was once arguably dicta, it is controlling after *Bruen*.

2127. By reaffirming *Heller* and *McDonald*, and counseling courts to adhere more closely to those cases, *Bruen* therefore effectively reaffirmed *Bogle*, which drew directly from *Heller* and *McDonald*, and, in any event, did not overrule it. *See*, *e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is 'bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court.'" (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004))).

Thus, as other judges in this District have concluded, the clear reasoning of *Heller*, *McDonald*, and *Bruen* forecloses any motion to dismiss a Section 922(g)(1) indictment. *See United States v. Centeno*, No. 22-cr-542 (DLC) (Feb. 6, 2023); *United States v. King*, No. 21-cr-255 (NSR), 2022 WL 5240928, at *4-5 (S.D.N.Y. Oct. 6, 2022); *United States v. Patterson*, No. 19-cr-231 (S.D.N.Y. Sept. 9, 2022); *United States v. Adams*, No. 20-cr-628 (AKH) (S.D.N.Y. Aug. 10, 2022); *United States v. Maurice*, No. 22-cr-48 (VB) (S.D.N.Y. Jul. 14, 2022). These decisions join dozens of other district court decisions since *Bruen* that have unanimously upheld the constitutionality of Section 922(g)(1).[3]

### C. Text and History Confirm that 18 U.S.C. § 922(g)(1) Is Consistent with the Second Amendment

#### 1. The Text of the Second Amendment and Its Historical Context Make Plain that Davila, a Convicted Felon, Cannot Mount a Successful Attack on 18 U.S.C. § 922(g)(1).

Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule

---

[3] *See* Brief for Defendants-Appellees at 17 n.5, No. 21-4121 (10th Cir. Jan. 17, 2023) (collecting cases).

of law through the commission of felony offenses—a conclusion reached by Courts of Appeals both before and after *Bruen*. *See United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023) (concluding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons"); *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019) ("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history," making it unnecessary to "reach the second"—now abrogated—"step" of that court's pre-*Bruen* precedent); *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (holding that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment"); *Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam) ("*Range I*") (holding that "those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses" can be prohibited from possessing firearms consistent with the Second Amendment's text and history, "whether or not those crimes are violent"), *vacated upon grant of rehearing en banc*, 56 F.4th 992 (3d Cir. 2023).[4]

Felon-disarmament laws are consistent with the Second Amendment's text, as historically understood. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Contrary to Davila's argument, felons do not fall within "the people" protected

---

[4]     Although the en banc Third Circuit vacated the panel opinion in *Range* and ultimately reached a contrary result, the panel opinion retains its persuasive value—particularly with respect to its discussion of the historical record. *See Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc).

by the Second Amendment, and "the right . . . to keep and bear Arms" is not "infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

The Second Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are entitled to be "members of the political community," *Heller*, 554 U.S. at 580. Section 922(g)(1) imposes a status-based restriction on who can possess firearms that reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment and are subject to disarmament laws on that basis are not "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580.

Consistent with that understanding, legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 & n.* (1998) (explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

It remains the case that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160 (citing 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement)); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Just as Congress and the States have required persons convicted of felonies to forfeit other rights belonging to members of the political community, Section 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction," *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment). While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," the decision in "*Heller* recognizes an exception for some Americans—to respect 'longstanding prohibitions on the possession of firearms by felons and the mentally ill,'" exceptions that are "historically grounded and sensible." *Id.* (quoting *Heller*, 554 U.S. at 626); *see also, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam); *Vongxay*, 594 F.3d at 1118.

*Bruen* makes particularly plain that those who are not law-abiding and responsible cannot successfully challenge laws that apply to them based on that status. The Supreme Court made "repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Jackson*, 69 F.4th at 503 (collecting citations); *see also Range I*,

53 F.4th at 271 (observing that the *Bruen* "majority characterized the holders of Second Amend-ment rights as 'law-abiding' citizens no fewer than fourteen times"). In one passage, the Court connected its explanation that the plaintiffs were "part of 'the people' whom the Second Amend-ment protects" with its observation that they were "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134. In another passage, *Bruen* approved "shall-issue" licensing regimes, explaining that such regimes "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law- abiding, responsible citizens.' " *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). In another passage, *Bruen* explained the historical analysis focuses on "how and why" a challenged regulation and a potential analogue each "burden a *law-abiding* citizen's right to armed self-de-fense." *Id.* at 2133 (emphasis added). Applying that historical test as the Court has described it would be superfluous where, as here, the challenged law applies only to those who are not law-abiding—and thus does not impose *any* "burden" on "a law-abiding citizen's right to armed self-defense." *Id.*

    That non-law-abiding citizens can be disarmed under a proper understanding of the consti-tutional text also explains the Court's specific assurances regarding the permissibility of prohibi-tions on the possession of firearms by felons. *Heller*, 554 U.S. at 626-27, 627 n.26, 635. In *Heller*, the Supreme Court parsed the text of the Second Amendment and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights." *Id.* at 635. Davila, by contrast, is a felon and therefore is "disqualified from the exercise of Second Amendment rights." *Id.*; *see also id.* at 631 (explaining that the District of Columbia had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane").

This Court has recognized the same limitation on the Second Amendment's scope in the context of challenges to other regulations: "As to the first step of the analysis, [this Court] ha[s] interpreted the core Second Amendment right identified in *Heller* to be the 'right of *law-abiding, responsible citizens.*'" *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020) (quoting *Jimenez*, 895 F.3d at 234; emphasis in *Jimenez*); *accord, e.g.*, *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (framing inquiry as whether and to what extent challenged prohibition burdens "the ability of *law-abiding citizens* to possess and use a firearm for self-defense (or for other lawful purposes)" (emphasis added)). And in *Bogle*, of course, this Court rejected a facial challenge to Section 922(g)(1) based upon *Heller*'s and *McDonald*'s reassurances grounded in history. Laws such as Section 922(g)(1) are therefore constitutional under the Second Amendment's text as informed by a variety of "historical justifications." *Heller*, 554 U.S. at 635.

### 2.      Section 922(g)(1) Is Consistent with This Nation's Historical Tradition of Firearms Regulation

A review of "this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, confirms the validity of laws disarming people because of felony convictions, whether or not the felonies were violent. Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the scope of the Second Amendment and the power of legislatures. *Id.* at 2133-34 (emphasis omitted). Two types of historical laws are particularly pertinent: (a) laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felonies.

### a.      Firearm Disqualification Laws

By the time of the Second Amendment's ratification in 1791, there was a robust tradition of legislatures exercising broad "discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms." *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 274 (recognizing historical authority to "categorically disqualify people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact"). Evidence from the constitutional ratification debates confirms that in light of this longstanding tradition of analogous regulation, the founders also understood that the precise type of regulation at issue in this case is constitutional: a legislature would not, in the founders' view, infringe the right to bear arms by "disarming the people . . . for crimes committed." *See infra* at 36-38 (discussing Pennsylvania Antifederalists' proposal in 1787).

*England.* Because the Second Amendment " 'codified a right inherited from our English ancestors,' " English legal tradition sheds light on the scope of the " 'right secured by the Second Amendment' "—which, as with the English right, " 'is not unlimited.' " *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. In 1689, for example, the government passed an "Act for the better securing the Government by disarming Papists and reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73

13

(1688).[5] Enacted shortly after the Glorious Revolution of 1688—when the Protestants King William and Queen Mary succeeded the Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith were among "those who are unwilling to obey the government and its laws." *Jackson*, 69 F.4th at 502; *see also Range I*, 53 F.4th at 275 (recognizing that Catholics were disarmed based on "perceived disrespect for and disobedience to the Crown and English law").

This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593). That predecessor specified that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142. And when they first formally claimed that right, the English ensured that the government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the members of that class had failed to demonstrate that they would abide by the law.

*Colonial America.* The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as untrustworthy or dangerous. Firearm

---

[5]    Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords 1685-1691*, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689); *Bill of Rights [1688]*, https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that "[i]t appears that all the Acts of" the first Parliament of William and Mary "were treated as being Acts of 1688" in official sources under an "old method of reckoning"— including the English Bill of Rights, discussed below, which was similarly enacted in 1689).

regulations directed toward disarming Native Americans and Black people were pervasive.[6] Other colonial laws "followed longstanding English practice" by disarming Catholics who refused to take an oath of allegiance. *Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (citing Virginia law); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020) (citing Maryland, Virginia, and Pennsylvania laws). While these specific "categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503. Moreover, "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws." *Range I*, 53 F.4th at 276 (collecting examples). *See also Lucha El Libertad*, 22 Cr. 644 (JSR), Dkt. 52 at 20 (finding "particularly

---

[6]      *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g.*, *Laws and Ordinances of New Netherland*, 1638-1674, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records of the Colony of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With the Charter, the Bill of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records of the Colony of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From the Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia from Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law).

relevant an extensive history in both England and the colonies of disarming those deemed danger-
ous").

    *The Revolutionary War.* Over the course of the Revolutionary War, American legislatures
passed numerous laws disarming individuals who failed to demonstrate loyalty to the emergent
American government. *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 277 (observing that
legislatures "disarm[ed] non-violent individuals because their actions evinced an unwillingness to
comply with the legal norms of the nascent social compact"). An early example is a 1775 Con-
necticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves
of the Continental Congress or the Connecticut General Assembly "made for the defence or secu-
rity of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep
any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at
1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial
governments disarm those who were "notoriously disaffected to the cause of America" or who
simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the
Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the
governments enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of
the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony
of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The
Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the
General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*,
at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-
13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia*
282 (1821) (1777 Va. law). These disarmament measures adopted during this early period of the

Republic reflect that "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people." *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 279 (recognizing that "legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms").

*Ratification debates.* The historical background of the Second Amendment's adoption provides particularly persuasive evidence that the founders understood that the constitutional right to bear arms is compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law. One "Second Amendment precursor[ ]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is particularly instructive. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great importance in the history of the federal Bill of Rights"). And the Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that: "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). Thus, the founding generation recognized that both "crimes committed" and "real danger of public injury" can independently supply grounds for a legislature to prohibit

firearm possession. *See Medina*, 913 F.3d at 158-59 ("The use of the word 'or' indicates that criminals, in addition to those who posed a 'real danger' (such as the mentally ill, perhaps), were proper subjects of disarmament."); *Range I*, 53 F.4th at 280 (observing that the proposal "distinguished between criminal convictions and dangerousness, and provided that *either* could support disarmament").

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added).

The Second Amendment as adopted does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including (but not necessarily limited to) "the felon," Cooley, *supra*, at 29, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"). Given the language of these influential proposals along with the apparent absence of any meaningful

founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals, courts "can assume it settled" that such regulations are "consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (discussing the proper inference to draw from the historical record regarding "sensitive places," which "yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited").

Each regulation discussed above demonstrates that the founders inherited a tradition under which a legislature has broad discretion to disarm classes of people they did not trust to follow the law. And, collectively, the effect was that only a subset of the founding generation would have "fully enjoyed the right to keep and bear arms." Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 116 (2011) (explaining that the founders "were perfectly willing to confiscate weapons from anyone deemed untrustworthy").

### b.    Felony Punishment Laws

In a separate vein, for centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was " 'the standard penalty for all serious crimes.' " *See Baze v.*

*Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas, but also non-violent conduct relating to forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who "escaped from jail after being condemned to death" for "forgery" or "horse-stealing"). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *accord Jackson*, 69 F.4th at 503 (explaining "[e]arly legislatures . . . authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property" and agreeing with *Medina*); *Range I*, 53 F.4th at 280-81 ("*A fortiori*, given the draconian punishments that traditionally could be imposed" for "non-violent" felonies including larceny, repeated forgery, and false pretenses, "the comparatively lenient consequence of disarmament under 18 U.S.C. § 922(g)(1) is permissible."). Thus, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160.

### c. Comparison to Section 922(g)(1)

The historical tradition surveyed above demonstrates Section 922(g)(1)'s constitutionality. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. Of course, Section 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it only applies to people who have removed themselves from the law-abiding citizenry by committing offenses punishable by more than one year of imprisonment. In any event, what the historical record shows is that legislatures historically disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today. History shows that legislatures' reasons for doing so could include a legislative judgment that the disarmed persons could not be counted upon to be responsible, law-abiding members of the polity, just as felon-dispossession statutes do today. And history demonstrates that people who committed felonies at the time of the founding would have been exposed to far more severe consequences than disarmament including capital punishment and estate forfeiture.

Davila suggests that the historical context is insufficient because scholars have not identified a law from the Founding Era that banned felons from possessing firearms. The Court should reject that argument because it reflects the precise analytical error that the Supreme Court rejected in *Bruen*: "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133 (emphasis in original). By demanding a historical twin, Davila's argument also effectively asks this Court not to "apply[ ] constitutional principles to novel modern conditions." *Id.* at 2134. But *Bruen* teaches that "the Second Amendment's historically fixed

meaning applies to new circumstances," and thus the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132.

### D.     Davila Fails to Differentiate Himself from the Historically Excluded Class

Davila also asserts an as-applied challenge. This argument should likewise be rejected.

The Second Circuit has not suggested that Section 922(g)(1) is subject to an as-applied Second Amendment challenge. *See Bogle*, 717 F.3d at 282-83 (holding that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons"). And the Court should follow the several Courts of Appeals that have concluded that Section 922(g)(1) is constitutional in all of its applications, thus foreclosing as-applied challenges. *See United States v. Massey*, 849 F.3d 262, 263 (5th Cir. 2017); *Rozier*, 598 F.3d at 771; *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009). As multiple courts have recognized, "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)," *Jackson*, 69 F.4th at 502, and Section 922(g)(1) is constitutional without regard to considerations such as the location or claimed purpose of the firearm possession, *United States v. Williams*, 24 F.4th 1209, 1211 (8th Cir. 2022), or the defendant's "present contributions to his community, the passage of time, or evidence of his rehabilitation," *Medina*, 913 F.3d at 160-61.

The Second Amendment "permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (citation omitted); *see also United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) ("Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court."). "A prohibition on firearm ownership . . . is a reasonable consequence of a felony conviction that the legislature is entitled to impose without undertaking the painstaking case-by-case

assessment of" considerations like "present contributions to his community, the passage of time, or evidence of his rehabilitation." *Medina*, 913 F.3d at 160-61; *see also United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (warning that to permit "highly fact-specific" as-applied challenges to Section 922(g)(1) would necessitate consideration of "countless variations in individual circumstances" and thus "would obviously present serious problems of administration, consistency and fair warning").

Even courts that have left the door open to as-applied challenges to Section 922(g)(1) based on the nature of the defendant's prior conviction do not permit such challenges based on the defendant's current circumstances. Davila offers no argument based on any circumstance specific to him, and his underlying felonies include violent felonies of assault and manslaughter, making this case quite unlike *Range*, where a defendant with a prior conviction for making a false statement to obtain food stamps brought a successful as-applied challenge in the Third Circuit. *See Range*, 69 F.4th at 98; *see also Lucha El Libertad*, 22 Cr. 644 (JSR), Dkt. 52 at 4 (rejecting as-applied challenge where the defendant "identified nothing about his circumstances" that justified as-applied relief). The only circumstances in which a Court of Appeals has suggested an as-applied Second Amendment challenge to Section 922(g)(1) might be valid involve underlying offenses where "the legislatures classified the challengers' offenses as misdemeanors, the crimes were nonviolent, the punishments imposed were lenient, and other jurisdictions also classified similar crimes as misdemeanors." *Folajtar*, 980 F.3d at 902 (describing *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc)); *Range*, 69 F.4th at 98 (defendant's underlying conviction involved a false statement to obtain food stamps). Davila would not benefit from the Third Circuit's outlier decision in *Range*. He is not merely a felon, but one with prior convictions for assault and manslaughter, who committed the current offense while on parole. There is no question that dangerous felons like

Davila were historically understood not to benefit from the protection of the Second Amendment. Indeed, even the Third Circuit distinguished the facts before it from cases involving violent criminals and dangerous felons. *See Range*, 69 F.4th at 105.

## III.   CONCLUSION

As the Second Circuit has recognized, and the Supreme Court has consistently affirmed, prohibitions on the possession of firearms by felons are longstanding and valid under the Second Amendment. Section 922(g)(1) is constitutional in all of its applications, and particularly as applied to violent and dangerous felons like Davila.

For the reasons set forth above, the defendant's motion to dismiss the Indictment should be denied.

Dated:  New York, New York
        August 8, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


By:     /s/ *Danielle R. Sassoon*
        Danielle R. Sassoon
        Assistant United States Attorney
        (212) 637-1115