```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  -v-<br><br>JONATHAN DAVILA,<br><br>         Defendant. | 23-cr-292 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

Jonathan Davila was indicted on one count of possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). ECF No. 6. In particular, the indictment alleges that "[o]n or about April 17, 2023, . . . the defendant, knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit, a loaded .22 caliber Phoenix Arms pistol, Model HP22A, and the firearm was in and affecting commerce." Id. at 1. Davila acknowledges he was convicted of a felony -- manslaughter in the first degree -- in New York state court in 2021. ECF No. 12, at 1.

On July 21, 2023, Davila moved to dismiss the indictment, contending § 922(g)(1) violates the Second Amendment. Id. The Government submitted opposition papers, and Davila filed a reply. After considering the parties' submissions, the Court now denies the motion.

1

I.  **Legal Standard**

The Second Amendment recognizes "an individual right to keep and bear arms for self-defense." N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2125 (2022). "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. at 2129-30. For a regulation of such conduct to pass constitutional muster, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Id. at 2130. Means-end scrutiny of the regulation forms no part of the analysis.

The framework for assessing whether a regulation is "consistent with the Nation's historical tradition of firearm regulation" differs according to the nature of the problem the regulation is meant to solve. Id. at 2130-32. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Id. at 2131. But "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." Id. at 2132.

"When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve

2

reasoning by analogy." Id. at 2132. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." Id. at 2133. In other words, "a modern-day regulation" need not be "a dead ringer for historical precursors" to survive constitutional scrutiny. Id. Instead, the regulations must be "relevantly similar" in light of "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2132-33 (emphasis added).

## II. Discussion

Davila argues § 922(g)(1) is unconstitutional facially and as applied to him. By his account, because § 922(g)(1) addresses "a general societal problem that has persisted since the 18th century" -- "the possession of guns by felons" -- the Government must "identify a tradition of distinctly similar founding-era regulations." ECF No. 12 ("Motion"), at 2.[1] And, his argument goes, "because no such historical tradition exists, prosecuting Davila under § 922(g)(1) violates his constitutional rights, notwithstanding the seriousness of his prior conviction for manslaughter or any other felony." Id. "[F]or the same reasons,"

---

[1] Here and elsewhere, internal quotation marks are omitted unless otherwise indicated.

3

Davila asserts, "there can be <u>no</u> constitutional application of the statute." <u>Id.</u>

In response, the Government offers three arguments, each of which, if correct, is sufficient to defeat the pending motion. <u>First</u>, still-binding Second Circuit precedent has held § 922(g)(1) to be constitutional. ECF No. 13 ("Opp."), at 4-7. <u>Second</u>, even if one were addressing the question on a blank slate, "felons do not fall within 'the people' protected by the Second Amendment." Opp. at 8-9. <u>Third</u>, even if "the people" protected by the Second Amendment includes felons, § 922(g)(1) is a permissible regulation because "history is replete with representative historical analogues," including "(a) laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felonies." Opp. at 12. The Court agrees with the Government's first and third arguments, but rejects the second.

**A. Binding precedent compels denial of Davila's motion.**

In <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), the Supreme Court held that "the Second Amendment confer[s] an individual right to keep and bear arms." <u>Id.</u> at 595. The Court cautioned, however, that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." <u>Id.</u> at 626. The Court reiterated that caution

4

in McDonald v. City of Chicago, 561 U.S. 742 (2010). See id. at 786 ("We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons."). Although the parties dispute whether those statements were dicta, see Motion at 6-7; Opp. at 5-6, that debate is of little consequence because the statements became binding on this Court when the Second Circuit adopted them in United States v. Bogle, 717 F.3d 281 (2d Cir. 2013) (per curiam). Specifically, in Bogle, the Second Circuit held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." Id. at 281-82.

Davila asserts Bogle is "no longer good law" in light of Bruen. Motion at 6-7. The Court disagrees. The Supreme Court stated in Bruen that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of . . . shall-issue licensing regimes," "which often require applicants to undergo a background check" and "are designed to ensure . . . that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." 142 S. Ct. at 2138 n.9. In addition, as three members of the Bruen majority separately emphasized, the Supreme Court's holding did not "disturb[] anything that [it] said in Heller or McDonald." Id. at 2157 (Alito, J., concurring); see id. ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."); see also id.

5

at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (reiterating that "[n]othing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"). Bogle's holding thus remains binding on this Court.

### B. Felons are "People."

While the above is sufficient to deny defendant's motion, if we examine the other, independent reasons given by the Government for denying defendant's motion, they are a mixed bag. In particular, the Court does not accept the Government's assertion that felons are wholly excluded from "the people" to whom the Second Amendment speaks. See U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.").

The Supreme Court has already held that "the people" protected by the Second Amendment -- much like "the people" protected by the First, Fourth, Ninth, and Tenth Amendments -- "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990). Moreover, "the term unambiguously refers to all members of the political community, not an unspecified subset." Heller, 554 U.S. at 580. There is no

6

basis for reading "the people" in the text of the Second Amendment to exclude felons.

**C. Section 922(g)(1) is consistent with the Nation's historical tradition of firearms regulation.**

The Government has nevertheless met its burden of demonstrating a historical tradition of firearms regulation that is sufficiently analogous to § 922(g)(1) to uphold the statute's legitimacy. See United States v. Jackson, 69 F.4th 495, 501-06 (8th Cir. 2023) (so holding in addressing a similar challenge to § 922(g)(1)). One set of analogous historical regulations involves "disqualify[ing] categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms." Opp. at 13 (quoting Jackson, 69 F.4th at 503). In particular, "the predecessor to our Second Amendment" in the 1689 English Bill of Rights -- to which Heller looked in holding that the Second Amendment recognizes an individual right -- see Heller, 554 U.S. at 593 -- provided, "Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by Law." Bruen, 142 S. Ct. at 2141-42 (quoting 1 Wm. & Mary c. 2, § 7, in 3 Eng. Stat. at Large 417 (1689) (emphasis added)).[2]

---

[2] It is true that the phrase "as allowed by Law" does not appear in the Second Amendment. But neither does "for their Defence." Yet after looking to the 1689 English Bill of Rights and other sources for an understanding of the Second Amendment's meaning, the Supreme

The same Parliament that enacted the English Bill of Rights passed a provision disarming Catholics who refused to denounce their faith. 1 Wm. & Mary c. 15, in 6 The Statutes of the Realm 71-73 (1688). That provision reflected "the English practice of disarming Catholics based on their perceived unwillingness to adhere to the King's sovereign dictates." Range v. Att'y Gen., 69 F.4th 96, 124 (3d Cir. 2023) (en banc) (Krause, J., dissenting) (citing Nicholas J. Johnson et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy 174 (3d ed. 2022)).

The English practice of status-based disarmament, tethered to a group's perceived danger or lack of trustworthiness, continued in colonial America. See Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 28-29 (2006). "Laws disarming groups such as slaves, freed blacks, Indians, and those of mixed-race ancestry were common."[3] Id. For instance, at least ten colonies disarmed Native Americans or Black

---

Court held the Second Amendment "protect[s] an individual right to keep and bear arms for self-defense." Bruen, 142 S. Ct. at 2125; see Heller, 554 U.S. at 592-95, 626-27.

[3] Of course, viewing those groups as dangerous or untrustworthy is odious and completely contrary to American law and societal values today. The Court must nevertheless be faithful to Bruen's framework, which is to assess whether historical firearms regulations are "relevantly similar" to those today. 142 S. Ct. at 2132. The historical regulations need not be commendable, or even lawful today under other constitutional provisions, to serve as relevant comparators for the analysis Bruen requires.

people because those groups were viewed as dangerous.[4] See also Michael A. Bellesiles, Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794, 16 Law & Hist. Rev. 567, 576 (1998) ("[L]egislatures followed the English example in denying the right to own guns to potentially dangerous groups: [B]lacks, slave and free; Indians; propertyless whites; non-Protestants or potentially unruly Protestants.").

Much like in 17th-century England, colonial Catholics were subject to disarmament in at least Maryland, Virginia, and Pennsylvania. See Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing

---

[4] See Laws and Ordinances of New Netherland, 1638-1674, at 18-19, 234-35 (1868) (1639 and 1656 New Netherland laws); 1 The Statutes at Large; Being A Collection Of All the Laws of Virginia 255-56 (1823) (1643 Virginia law); 5 Records of the Colony of New Plymouth 173 (1856) (1675 Plymouth law); 2 Records of the Colony of Rhode Island and Providence Plantations 561 (1857) (1677 Rhode Island law); 2 The Statutes at Large; Being a Collection of All the Laws of Virginia 481-82 (1823) (1680 Virginia law); Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne 341 (1753) (1694 New Jersey law); 2 The Statutes at Large of Pennsylvania from 1682 to 1801, at 235 (1896) (1706 Pennsylvania law); 1 The Laws of Maryland, With the Charter, the Bill of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments 117-18 (1811) (1715 Maryland Law); A Complete Revisal of All the Acts of Assembly, of the Province of North Carolina, Now in Force and Use 152-54 (1773) (1753 North Carolina law); 6 The Statutes at Large of Pennsylvania from 1682 to 1801, at 319-20 (1899) (1763 Pennsylvania law); Digest of the Laws of the State of Georgia from Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799, at 153-55 (1800) (1768 Georgia Law).

Arms, 20 Wyo. L. Rev. 249, 263 (2020). During the Revolutionary War, the Continental Congress and at least seven colonies disarmed those who refused to pledge loyalty to the new American government.[5]

Another set of historical provisions the Government convincingly mobilizes are the punishments at common law and at the founding for felonies.[6] As Blackstone explained, a felony at common law was "an offence which occasions a total forfeiture of

---

[5] See The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, at 1993 (1890) (1775 Connecticut law); 4 Journals of the Continental Congress 1774-1789, at 205 (1906) (resolution of March 14, 1776); 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479-84 (1886) (1776 Massachusetts law); 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (1862) (1776 Rhode Island law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 North Carolina law); Acts of the General Assembly of the State of New Jersey at a Session Begun on the 27th Day of August, 1776, at 90 (1777) (1777 New Jersey law); 9 The Statutes at Large of Pennsylvania from 1682 to 1801, at 112-13 (1903) (1777 Pennsylvania law); 9 The Statutes at Large; Being a Collection of All the Laws of Virginia 282 (1821) (1777 Virginia law).

[6] The Government also cites some historical evidence the Court finds less persuasive. In particular, the Government points to rejected proposals from Pennsylvania, Massachusetts, and New Hampshire during the constitutional ratification debates that would have placed express limits on the categories of people who could bear arms. See Opp. at 17-18. The Government argues those proposals are evidence that "it would have been obvious to the founders that certain groups . . . could properly be subject to disarmament laws." Id. at 18. But any inference from a rejected proposal is tenuous at best; those proposals may well have been rejected because the founders did not want the nascent Constitution to countenance group-based limitations on the right to bear arms. That said, because the Government's other evidence is persuasive, those rejected proposals need not carry the day.

10

either lands, or goods, or both . . . and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, Commentaries on the Laws of England 95 (1769). The First Congress made numerous felonies, spanning the gamut from forging a public security to treason, punishable by death. See An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 112-15 (1790). Until the end of the 18th century, many American jurisdictions provided for forfeiture of a felon's estate. See Beth A. Colgan, Reviving the Excessive Fines Clause, 102 Calif. L. Rev. 277, 332-34 (2014); Richard E. Finneran & Steven K. Luther, Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law, 35 Cardozo L. Rev. 1, 6, 32-42 (2013). That the founders understood felons to be punishable by death and estate forfeiture leaves little doubt that they also understood that felons could be permissibly disarmed.

Davila does not mount much of a rebuttal to the foregoing evidence. For instance, Davila points out that "[m]any people with felony convictions ultimately returned to society in the founding era," and "before the founding, many people with felony convictions were pardoned." ECF No. 14, at 11. Even so, those statistics do little to challenge the implication that the founding generation understood felons could _permissibly_ be disarmed. Davila would elevate the Government's burden to require a showing that felons

were <u>inevitably</u> disarmed. But that is not the burden the Government faces.

The regulations the Government cites are sufficiently analogous to § 922(g)(1) along the relevant metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." <u>Bruen</u>, 142 S. Ct. at 2132-33. The "how" -- disqualifying categories of people from possessing firearms -- is identical. The "why" -- certain groups were deemed untrustworthy or dangerous -- is of a piece with the apparent rationale for § 922(g)(1): to remove guns from the hands of those who have harmed society and breached its trust.

Davila takes issue with resorting to analogical reasoning at all in this context. In his telling, because the presence of both felons and firearms is "a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Motion at 5-6. But "<u>Bruen</u> observed that historical inquiries must be more flexible when a contemporary regulation implicates unprecedented societal concerns or dramatic technological changes." <u>Range</u>, 69 F.4th at 120 (Krause, J., dissenting). "Section 922(g)(1) is such a regulation, as the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate

travel were unknown at the Founding." Id. In short, Davila's demand for a "historical twin," rather than a "representative historical analogue," asks for too much. Bruen, 142 S. Ct. at 2133.[7]

### III. Conclusion

For the reasons explained above, the Court denies the motion to dismiss the indictment.

SO ORDERED.

New York, NY
August 22, 2023

JED S. RAKOFF, U.S.D.J

---

[7] Davila's citations of Range v. Attorney General, 69 F.4th 96 (3d Cir. 2023) (en banc), in which the Third Circuit held § 922(g)(1) unconstitutional as applied to one particular defendant who had committed a non-violent felony, are unpersuasive. The Government has met its burden in this case of demonstrating a historical tradition of firearms regulation that supports the constitutionality of § 922(g)(1) facially and as applied to Davila.